OPINION JUDGMENT ENTRY
{¶ 1} Defendant-appellant Benjamin Whitney Uselton appeals his conviction and sentence in the Ashland County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
{¶ 2} The following evidence was presented at trial: on April 23, 2002, appellant sold two tablets of Xanax to Adam Howell. On April 24, 2002, at approximately 5:30 p.m., nineteen year old Howell and his sixteen year old friend Mike Roberts each took a Xanax tablet. By 7:30 p.m., both Howell and Roberts were staggering and incoherent. Howell and Roberts then decided to drive to a residence to meet appellant for the purchase of more Xanax. Another young man, Jordan Starkey, went with them.
{¶ 3} After arriving at the residence, Howell was stumbling around, barely able to make it up the steps to the front door. Both Roberts and Howell were slurring their speech and stumbling. Appellant sold Howell four additional Xanax tablets. Appellant told Ashland County Deputy Sheriff Scott Smart he knew Howell was "really messed up" at the time he sold him the drugs. As Howell was leaving, he gave two tablets to his friends and took one himself. He lost the fourth one, and returned to appellant to buy an additional Xanax tablet.
{¶ 4} While returning home, Howell sideswiped another car. He told Starkey he thought he blacked out, and Starkey himself had fallen asleep and was awakened by the crash.
{¶ 5} Starkey went home at 11:00 p.m. Howell and Roberts went to Roberts' house, where his twin sister was the only person at home. Deanna Roberts testified both men were so under the influence of drugs they could hardly walk, and Howell fell to the floor in the hallway. At about 11:45 p.m., the boys left again.
{¶ 6} At 3:23 a.m., Ohio Highway Patrol Troopers arrived at the scene of an accident. The accident occurred a considerable amount of time prior to the troopers' arrival. Both Howell and Roberts were found dead at the scene. The car crashed into the foundation wall of a barn.
{¶ 7} Appellant was indicted on two counts of involuntary manslaughter, in violation of R.C. 2903.04(A), and three counts of trafficking in drugs, in violation of R.C. 2925.03. Appellant plead not guilty to the charges.
{¶ 8} On April 4, 2003, a jury found appellant guilty on all five counts of the indictment.
{¶ 9} On May 23, 2003, the trial court sentenced appellant to consecutive five year sentences for his conviction on the two involuntary manslaughter counts, and concurrent nine month sentences on each of the three drug trafficking convictions. The trial court ordered the concurrent nine month sentences be served consecutive to the sentences imposed for the two involuntary manslaughter convictions. Accordingly, appellant's aggregate sentence is ten years and nine months.
{¶ 10} It is from these convictions and sentences, appellant now appeals raising the following assignments of error:
{¶ 11} "I. The evidence is insufficient to sustain the convictions of involuntary manslaughter, R.C. 2903.04(A).
{¶ 12} "II. The verdicts of involuntary manslaughter are against the weight of the evidence.
{¶ 13} "III. The trial court erred by introducing into evidence the franklin county toxicology report which included numerous portions which were not testified to at trial.
{¶ 14} "IV. The trial court erred by allowing the jury to consider prejudicially irrelevant evidence in determining its verdict.
{¶ 15} "V. The trial court erred in allowing the state to adduce evidence of appellant's inappropriate behavior in the courthouse while the trial was in recess.
{¶ 16} "VI. The trial judge erred in sentencing the appellant to more than the minimum sentence for the offense of involuntary manslaughter, R.C. 2903.04(A).
{¶ 17} "VII. The trial court erred by sentencing the appellant to serve consecutive sentences.
{¶ 18} "VIII. The trial court erred in failing to find the offense of drug trafficking, R.C. 2925.03 and involuntary manslaughter, R.C. 2903.04(A), to be allied offenses pursuant to R.C. 2941.25(B).
{¶ 19} "IX. The appellant was denied his right to the effective assistance of trial counsel."
 I
{¶ 20} In his first assignment of error, appellant maintains there is insufficient evidence to sustain his convictions on the two counts of involuntary manslaughter. Appellant argues the evidence fails to establish the element of proximate cause as the deaths were not a legally foreseeable result of the drug sales, but rather, a result of the independent acts of those who purchased the drugs from him.
{¶ 21} In State v. Jenks (1981), 61 Ohio St.3d 259,574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. at paragraph two of the syllabus.
{¶ 22} R.C. 2903.04(A) reads:
{¶ 23} "(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."
{¶ 24} Appellant cannot be held responsible for consequences no reasonable person could expect to follow from his conduct; however, he will be held responsible for consequences which are direct, normal, and reasonably inevitable — as opposed to extraordinary or surprising — when viewed in the light of ordinary experience. Appellant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of risk created by his conduct.State v. Losey (1985), 23 Ohio App.3d 93, 95; State v.Chambers (1977), 53 Ohio App.2d 266.
{¶ 25} On direct examination, Jackson Bice, a friend of the decedents and appellant, testified at trial regarding the second purchase of Xanax from appellant at the apartment:
{¶ 26} "Q. When Adam came in, did he have a conversation with Uselton?
{¶ 27} "A. Yeah, he tried to. He had a conversation, but it wasn't really much of a conversation.
{¶ 28} "Q. Explain yourself.
{¶ 29} "A. Well, when Adam first came in, you know, I could tell that he was really messed up. I mean — he had black like — like a black — his cheeks were black. Like underneath his eyes were black. And he was just talking really slow. He was walking really sluggish. Just uncoordinated.
{¶ 30} "And at one point he picked up the phone — I don't know if he was trying to call somebody or what he was trying to do, but he picked up the phone and he couldn't get it back on the ringer. He tried to put it on and it fell off. He just — he didn't look like he was in any condition to be doing anything.
{¶ 31} "* * *
{¶ 32} "Q. Did you see him having trouble — did you see anything to indicate Adam was having trouble walking?
{¶ 33} "A. I saw him walk into like the corner of a chair. Just kind of like bump it. That kind of stuff. I mean he didn't do it a whole lot, but I could notice there was some difficulty in him walking.
{¶ 34} "Q. Did Whitney Uselton during that time that you were in the apartment with Adam and Whitney, did Whitney Uselton relate problems that he had — Whitney Uselton had when he took Xanax and problems he had driving; did Whitney Uselton discuss that?
{¶ 35} "A. Yeah, he told us about one time that he took I don't know how many Xanax it was. Six or seven Xanax one time and was driving around and got in two accidents within a half hour. He just talked to us about pretty much that. I mean . . .
{¶ 36} "A. Did you ever hear Whitney Uselton say to Adam don't drive?
{¶ 37} No, I didn't." Tr. at 677-678, 687.
{¶ 38} Scott Smart, a Deputy Sheriff for Ashland County, interviewed appellant on April 28, 2002. A transcript of the videotaped interview was introduced at trial as evidence. Deputy Smart testified:
{¶ 39} "Q. Tell us what he said in regards to that relationship and the events leading up to the death.
{¶ 40} "A. He explained to me that he was good friends with Adam Howell. That he had known Mike just from getting high with him in the past. He told me that he talked to Adam around midnight the night of the accident. That the night before, he had met Adam and Mike over at Mike's house here in Ashland, and that was the first time that he had sold them Xanax pills.
{¶ 41} "Q. Which ones did he sell the Xanax pill on April 23rd?
{¶ 42} "A. He sold that to Adam and Mike.
{¶ 43} "Q. To both of them?
{¶ 44} "A. Correct.
{¶ 45} "Q. Go ahead.
{¶ 46} A. The following day, Adam and Mike and another boy, who was later identified as Jordan Starkey, went over to a residence in Mansfield on Park Avenue West where the defendant was at. Mike and Jordan stayed in the car and Adam went into the house to talk with the defendant. The purpose for going over there was to buy more Xanax pills, for which that did happen. Adam purchased five more Xanax pills from the defendant.
{¶ 47} "While they were talking, the defendant told me he noticed Adam was stumbling around, and that Adam told him that him and Mike had taken the Xanax pill on the way over there that they had purchased the night before. Adam, Mike and Jordan Starkey then leave, and a short time later they come back. Adam comes back into the house and tells the defendant that they lost one of the pills; that he needs some more. So he buys three more pills, and they leave again.
{¶ 48} "He told me he talked to Adam two more times that night. Once — by phone. Once around 10 p.m. and again around midnight. And he said he could tell Adam was messed up because he was slurring his speech real bad. And that purpose of the last conversation was Adam was telling him that him and Mike were on their way back over to Mansfield to see him.
{¶ 49} "Q. What else did — that conversation that he thinks happened around 12 o'clock, what else did he say Adam said?
{¶ 50} "A. Adam had told him that he'd taken three of the Xanax pills, and that he had sideswiped two cars that night. The defendant claims that he told him not to be driving. And while we were talking about accidents, the defendant told me about two accidents he had been into just a couple months prior to Adam and Mike's accident.
{¶ 51} "Q. So the defendant claims that at 12 o'clock when he talked — 12 o'clock when he talked to Adam, that Adam was messed up, said he had taken three Xanax, and the defendant claims he told him not to drive?
{¶ 52} "A. Correct.
{¶ 53} "Q. And then you started talking about accidents?
{¶ 54} "A. Correct.
{¶ 55} "Q. What did the defendant tell you about accidents in regards to Xanax, auto accidents?
{¶ 56} "A. He said that he had been in two accidents while taking Xanax. They happened a couple months prior to this accident we're talking about now. He also told me about a roommate he had in college that had been in an accident while taking Xanax.
{¶ 57} "Q. Did he talk to you other than the accident that he'd been in and his roommate had been in on Xanax, did he tell you anything else about Xanax that would show you he knew about Xanax?
{¶ 58} "A. He explained to me that when you're taking Xanax, you don't realize just how messed up you really was. That you build up a tolerance to Xanax rather quickly. He explained to me he's used other drugs before — Vicodin, Percocet, Morphine, OxyContin, along with Xanax, and that out of all those, Xanax is the only one that makes you zone out and forget about what you've been doing.
{¶ 59} "* * *
{¶ 60} "Q. In your conversation with him, did he accept — or say anything regarding accepting responsibility for the death of Adam or Mike?
{¶ 61} "A. Yes, he did.
{¶ 62} "Q. What did he say?
{¶ 63} "A. He told me that he felt responsible for the death of Adam and Mike. That had he not sold them the pills, they would still be alive today. He explained while using Xanax himself, he didn't care about anything. He was reckless." Tr. at 712-715, 717.
{¶ 64} Upon review, appellant could have legally foreseen the deaths of Howell and Roberts. Appellant knew the decedents were driving to Mansfield to purchase more Xanax, he knew they took the tablets he sold them previously, he knew their condition when they were at the apartment for the second purchase, and he knew when they left they would be driving, as he claims he told them not to drive. Most importantly, appellant knew the effects of Xanax from his personal experience in taking the drug. He himself admitted it made him reckless and unaware of how "messed up" he was. He himself had been in two accidents while under the influence of Xanax. Based upon the above, it is clear appellant knew the decedents had taken the drugs and were "messed up" at the time he sold them additional tablets. He knew they were driving to purchase the additional tablets. From his own experience, he knew driving under the influence of Xanax could result in serious physical harm or death.
{¶ 65} Appellant could have reasonably anticipated death to be a likely result of his actions. In other words, ordinary experience made it foreseeable appellant's illegal actions would likely cause the death of the decedents, Adam Howell and Mike Roberts. See, State v. Vansickle, (March 11, 1992), Licking App. No. CA-3682.
{¶ 66} The first assignment of error is overruled.
 II
{¶ 67} In his second assignment of error, appellant maintains his convictions for involuntary manslaughter are against the manifest weight of the evidence, as the verdicts were necessarily based upon the jury's assessment of the credibility of each party's experts. Appellant argues the jury's reliance on the State's witnesses was misplaced, and the State did not establish the drug sales as the proximate cause of the deaths.
{¶ 68} Pursuant to Jenks, supra, on review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541
citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1, 10 Ohio St.2d 230,227 N.E.2d 212.
{¶ 69} The State's expert, James Ferguson, Chief Toxicologist and Director of Forensic Toxicology for the Franklin County Coroner's office, testified his testing revealed Adam Howell had a sufficient quantity of Xanax in his blood to have caused him to be impaired while driving. He found the presence of benzodiazepines at a level of 5.48 micrograms percent in the blood, and alprazolam present at a level of 49.5 nanograms per milliliter. He calculated Howell would have had to take two or three 2-milligrams tablets to have the amount of Xanax in his blood. Ferguson does not hold a medical degree.
{¶ 70} In response, appellant introduced two experts to rebut the findings of Ferguson. Amanda Jenkins, Ph.D. of the Cuyahoga County Coroner's office, testified the formula used by Ferguson was flawed and outdated. According to Dr. Jenkins, it is now accepted in the field that Xanax is subject to postmortem distribution in the body which will elevate the levels of the findings by an increase of 2.8. Dr. Jenkins tested Howell's urine and found it positive for benzodiazepines and alprazolam, but his blood came out negative for benzodiazepines. Howell's blood was positive for cocaine and marijuana. Jenkins opined there is one way to determine dose in a decedent, which is to calculate the total body burden, measuring the drug in multiple specimens. The test was not done in this case. She concluded Adam Howell was not under the influence of benzodiazepines at the time of his death.
{¶ 71} Michael Evans, Ph.D., an expert toxicologist, concurred with Dr. Jenkins regarding Mr. Ferguson's testing. Dr. Evans testified Mr. Ferguson's test results actually establish there was an insufficient amount of Xanax in Howell's blood to have rendered him impaired.
{¶ 72} Based upon the testimony of Dr. Jenkins and Dr. Evans, appellant maintains the jury clearly lost its way and was not able to understand the complexity of the issues. He concludes the jury's reliance upon Ferguson's outdated testing methods, opposed to appellant's Ph.D. experts from the Cuyahoga County Coroner's office, was inherently unreasonable. We disagree.
{¶ 73} Appellant would have us substitute our judgment for that of the jury in determining the credibility of appellant's experts, and conclude that the jury lost its way because it could not have reasonably found credible evidence to overcome the opinions of these experts. This we will not do.
{¶ 74} We are persuaded from the transcript before us the jury had competent credible evidence, both lay and expert, including appellant's own admissions, as noted supra, to establish the causation of the decedents' impairment at the time of the accident was due, in part, to the Xanax supplied by appellant.[1]
{¶ 75} Appellant further argues the jury lost its way in considering the crash reconstruction expert testimony.
{¶ 76} The State introduced Kyle Ross, a crash investigator for the Ohio State Highway Patrol, who testified the tire tracks of the vehicle gradually moved off the traveled portion of the roadway, went onto the grass and down a slope. Ross opined he observed no indication of braking, swerving or any type of evasive action.
{¶ 77} Appellant introduced James Crawford, a crash reconstructionist for Introtech Crash Reconstruction, who testified the look of the grass in the disturbed area appears consistent with application of anti-lock brakes. He opined the marks were within the normal range of reaction times, and he could not say the driver was asleep at the time of the accident.
{¶ 78} Appellant argues the State's expert could not exclude the possibility braking occurred, and appellant's expert established the evidence was consistent with the attempted application of anti-lock brakes; therefore, it was unreasonable for the jury to ignore the testimony.
{¶ 79} Again, we will not substitute our judgment for that of the jury. The jury is free to accept all, part, or none of the testimony, and the fact appellant offered an expert witness does not mean the jury must accept his conclusions, even if uncontradicted. The weight to be given evidence and credibility of witnesses are issues for the jury, not the appellate court. See State v. Jamison (1990), 49 Ohio St.3d 182, and State v.Jenks (1991), 61 Ohio St.3d 259.
{¶ 80} Appellant's second assignment of error is overruled.
 III, IV, V
{¶ 81} Appellant's third, fourth and fifth assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
{¶ 82} Appellant maintains the trial court erred by introducing into evidence the Franklin County toxicology report, which included numerous portions not testified to at trial.
{¶ 83} Appellant concedes the State redacted portions of the report because Mr. Ferguson did not testify about the subject matter, but maintains the trial court erred in admitting the report with the redactions. Specifically, appellant argues the report contained hearsay information taken from literature on the subject which Mr. Ferguson based his report upon. Further, appellant asserts he identified conclusions made by Mr. Ferguson inconsistent with evidence presented by the State at trial. Finally, appellant argues the number stated in the report is not properly correlated. Appellant concludes the report constitutes unreliable hearsay. We disagree.
{¶ 84} As stated above, it is for the jury to weigh the credibility of the evidence and the witnesses, and we will not substitute our judgment for that of the jury absent an abuse of discretion by the trial court in the admission of this evidence. An abuse of discretion connotes more than an error of law or judgment; it implies the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140. The admission or exclusion of evidence rests in the sound discretion of the trial court.State v. Sage (1987), 31 Ohio St.3d 173, 180, 510 N.E.2d 343. Our task is to look at the totality of the circumstances in the particular case under appeal, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing or excluding the disputed evidence. State v. Oman
(Feb. 14, 2000), Stark App. No. 1999CA00027.
{¶ 85} The portions of the report cited by appellant are not offered for the truth of the matter asserted, but rather as part of the foundation of the expert's opinion, and appellant has failed to demonstrate actual prejudice created by the introduction of this evidence. We do not find the trial court abused its discretion in admitting the report with the redactions.
{¶ 86} Appellant also maintains the trial court erred by allowing the jury to consider prejudicially irrelevant evidence in determining its verdict.
{¶ 87} Particularly, appellant argues the State, upon direct examination of Jordan Starkey, introduced evidence appellant sold marijuana and cocaine to the decedents. The following exchange took place during trial:
{¶ 88} "Q. Do you know where Adam got the weed?
{¶ 89} "A. No, I don't.
{¶ 90} "Q. And you said — did you smoke some of that marijuana that night?
{¶ 91} "A. Yes.
{¶ 92} "Q. And you said it was sprinkled with coke?
{¶ 93} "A. Yes.
{¶ 94} "Q. And where did that — "coke," you mean cocaine?
{¶ 95} "A. Yes.
{¶ 96} "Q. Where did that coke came from?
{¶ 97} "A. I assume from Whitney.
{¶ 98} "Q. Pardon?
{¶ 99} "A. I'm assuming from Whitney.
{¶ 100} "MR. HYDE: Objection, Your Honor.
{¶ 101} "THE COURT: Hold on. You can cross-examine on that point, counsel. That's overruled." Tr. at 205.
{¶ 102} Appellant argues the testimony is inadmissible "other acts" evidence in violation of Evid. R. 404(B), and is prejudicially irrelevant. We disagree.[2]
{¶ 103} Appellant fails to demonstrate actual prejudice from the admission of the testimony. Appellant in his defense pointed to marijuana use in the days preceding the accident, and appellant himself admitted to selling drugs. We do not find the testimony "assuming" appellant sold the drugs inadmissible other acts evidence.
{¶ 104} Additionally, appellant argues Kyle Ross' testimony as a crash investigator is impermissible "vouching" evidence. We disagree.
{¶ 105} Ross testified at trial:
{¶ 106} "Q. Based on your training and experience as a highway patrolman, crash investigator, what you saw at the scene, photographs here, do you have an opinion as to whether the driver of this vehicle was driving impaired?
{¶ 107} "A. Yes.
{¶ 108} "Q. What is that opinion?
{¶ 109} "MR. HYDE: I'm going to object to that, Your Honor.
{¶ 110} "THE COURT: It's overruled. It's overruled. You may answer. You may answer, Trooper.
{¶ 111} "A. Thank you, sir. My opinion is that this driver in this crash absolutely was impaired. He took no signs of evasive action. He traveled for over a distance of a football field and again some. 352 feet off the roadway. 352 feet past the distance of a football field into this. I would absolutely say no evasive action at all." Tr. at 600.
{¶ 112} Appellant argues Ross' opinion testimony is impermissible as he improperly "vouches" for the State's case, and an expert is prohibited from invading the territory of the jury by interjecting his opinion concerning the truthfulness of any witness. Additionally, appellant argues it is improper for the witness to provide a personal opinion as to the ultimate fact at issue.
{¶ 113} Evid.R. 704 states:
{¶ 114} "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."
{¶ 115} Upon review, we do not find the trial court abused its discretion in admitting the opinion testimony of Kyle Ross pursuant to Evid.R. 704.
{¶ 116} Appellant further maintains the trial court erred in allowing the state to adduce evidence of appellant's inappropriate behavior in the courthouse while the trial was in recess.
{¶ 117} On cross-examination, appellant questioned Deanna Roberts in regards to a letter she wrote to the Ashland newspaper. She stated in the letter appellant showed no remorse for the incident. She admitted in her testimony appellant e-mailed her and apologized for her loss. She stated she did not include this in the letter, because she did not feel he was remorseful.
{¶ 118} On redirect, the State elicited testimony from Ms. Roberts regarding incidents she alleged occurred between her family and the appellant. Specifically, she testified appellant was laughing in the hallway and carrying on with his friends before the trial.
{¶ 119} We do not find the trial court abused its discretion in admitting the testimony of Deanna Roberts, as appellant opened the door for the testimony in cross-examining Ms. Roberts as to appellant's remorse.
{¶ 120} Appellant's third, fourth and fifth assignments of error are overruled.
 VI, VII
{¶ 121} Appellant's sixth and seventh assignments of error raise common and interrelated issues; therefore, we will address the assignments together.
{¶ 122} Appellant challenges his sentence imposed by the trial court. In sentencing appellant, the trial court stated on the record:
{¶ 123} "Moving to the statutory sentencing factors that apply, the court notes the following. Under the recidivism factors, under recidivism likely, the court is finding that the offender did demonstrate a pattern of drug abuse related to the offense and refused to properly acknowledge the pattern or refused treatment in that the defendant has attempted to minimize his culpability, indicating to this court that future similar conduct would be likely to reoccur in the future.
{¶ 124} "Under the recidivism unlikely factor, the court does note the offender has not been adjudicated delinquent prior to this offense, giving the offender the benefit of the doubt on that issue, and has no prior adult criminal conviction.
{¶ 125} "With regard to the seriousness factors, under more serious, obviously, the victims did suffer serious physical harm as a result of this offense. There were two fatalities. Under the less serious category, the court does find that the victims did facilitate the offense by their own drug abuse that night.
{¶ 126} "The court notes the following additional factors which weight more heavily towards a significant prison term. The court does find that this defendant was an experienced drug user. He knew the radical and immediate effect these illegal pills would have upon these first-time users. Therefore, he had an obligation to do more than just say don't drive. That admonition would obviously have little effect on an already impaired young person.
{¶ 127} "This defendant took a known risk when he sold multiple pills to each decedent under these particular circumstances.
{¶ 128} "This defendant admits to having taken marijuana and other drugs on a daily basis from the time he was 17 until well after this incident. This is an astounding fact to this court. Certainly, he could have obtained treatment or other preventative measures before this tragedy occurred.
{¶ 129} "Now the court does note the following factors which are in mitigation against the maximum penalty in this matter. As previously noted, both decedent Adam Howell and Mike Roberts were impaired from voluntarily ingesting illegal drugs themselves that evening. Further, the defendant has no significant prior criminal history. And the defendant is a young man, as noted, age 20.
{¶ 130} "The court does note under Section 2929.13(D) that for all first degree felonies, there is a presumption of a prison term, and based upon the seriousness of these offenses and the other factors previously noted, this court does find that the presumption has not been rebutted and a prison term is appropriate.
{¶ 131} "Further, under Section 2929.14(B), this court does find that the shortest prison terms would demean the seriousness of these offenses. And further, under Section 2929.14(C), this court does find, as noted previously, that the maximum prison terms are not appropriate under these facts.
{¶ 132} "Regarding the imposition of consecutive prison terms, the court does find under Section 2929.14(E)(4) that consecutive prison terms are necessary to protect the public from future harm by this offender and others similarly situated in the future; and, two, that consecutive terms are not disproportionate to other sentences; and, three, that the harm here is so great that a single prison term would not adequately reflect the seriousness of the defendant's conduct.
{¶ 133} "Therefore, this court is finding that it is appropriate that each of the felonious assault counts be served consecutive to one another, and that the trafficking in drugs counts are independent offenses properly to be served consecutive to the manslaughter sentence as well." Tr. at 1291-1294.
{¶ 134} Appellant maintains the trial court erred in sentencing appellant to more than the minimum sentence for the offense of involuntary manslaughter. R.C. 2929.14 sets forth the possible term for the first degree felony as three to ten years. Pursuant to R.C. 2929.13(D) a prison term is presumed for a felony of the first degree. Thus, the minimum sentence is three years for each conviction. The trial court sentenced appellant to five years on each count.
{¶ 135} Appellant argues the trial court failed to first consider the minimum sentence before sentencing appellant, and did not provide sufficient reasoning on the record for the departure from the minimum term.
{¶ 136} R.C. 2929.14(B) states:
{¶ 137} "(B) Except as provided in division (C), (D)(1), (D)(2), (D)(3), or (G) of this section, in section 2907.02 of the Revised Code, or in Chapter 2925. of the Revised Code, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless one or more of the following applies:
{¶ 138} "(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
{¶ 139} "(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
{¶ 140} In interpreting this requirement, the Supreme Court of Ohio has held: "R.C. 2929.14(B) does not require that the trial court give its reasons for its findings that the seriousness of the offender's conduct will be demeaned or that the public will not be adequately protected from future crimes before it can lawfully impose more than the minimum authorized sentence."State v. Edmonson, 86 Ohio St.3d 324, 1999-Ohio-110, syllabus. (Emphasis in original.) Rather, "the record of the sentencing hearing must reflect that the court found that either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence." Id. at 326; State v.Comer, 99 Ohio St.3d 463, 2003-Ohio-4165.
{¶ 141} Upon review, we find the trial court did not error in sentencing appellant to more than the minimum term.
{¶ 142} Appellant further argues the trial court erred by sentencing appellant to serve consecutive sentences. Appellant contends the record does not support consecutive sentences as such sentences are to be reserved for the worst offenses and offenders.
{¶ 143} In order to impose consecutive sentences when an offender is convicted of multiple offenses, a trial court must first find consecutive service is necessary to protect the public from future crime or to punish the offender. R.C. 2929.14(E)(4). The court must also find consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Id. Finally, the trial court must find one or more of the following: "a) the offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17 or 2929.18 of the Revised Code, or was under post-release control for a prior offense; b) the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct; or, c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender." Id. If a trial court imposes consecutive sentences, the trial court must give its reasons for imposing the given sentence. R.C. 2929.19(B)(2)(c).
{¶ 144} Based upon the reasons the trial court expressed at the sentencing hearing, as set forth supra, we find the trial court's imposition of consecutive sentences was not contrary to law.
{¶ 145} Appellant's sixth and seventh assignments of error are overruled.
 VIII
{¶ 146} In the eighth assignment of error, appellant maintains the trial court erred in failing to find the offenses of drug trafficking, in violation of R.C. 2925.03 and involuntary manslaughter, in violation of R.C. 2903.04(A), to be allied offenses pursuant to R.C. 2941.25(B).
{¶ 147} According to appellant, he could not commit the crime of trafficking in drugs without committing involuntary manslaughter. As a result, appellant argues the trial court's sentences on both counts violate both the double jeopardy clause and R.C. 2941.25(A). We disagree.
{¶ 148} R.C. 2941.25 states:
{¶ 149} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
{¶ 150} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
{¶ 151} The applicable test for determining whether or not two crimes are allied offenses of similar import is found in Statev. Blankenship (1988), 38 Ohio St.3d 116, 526 N.E.2d 816. If the elements of the crimes "correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import." Id. at 117, 526 N.E.2d 816. However, if the elements do not correspond, the offenses are of dissimilar import and multiple convictions are permitted.
{¶ 152} R.C. Section 2903.04 sets forth the elements for involuntary manslaughter:
{¶ 153} "(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony. * * *
{¶ 154} R.C. Section 2925.03 sets forth the elements for drug trafficking:
{¶ 155} "(A) No person shall knowingly do any of the following:
{¶ 156} "(1) Sell or offer to sell a controlled substance;
{¶ 157} "(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, when the offender knows or has reasonable cause to believe that the controlled substance is intended for sale or resale by the offender or another person."
{¶ 158} After reviewing the elements set forth in the statutes, supra, we conclude involuntary manslaughter and trafficking in drugs are not allied offenses of similar import, because the commission of one will not automatically result in the commission of the other. As a result, appellant may be punished for both offenses, and his sentence for each offense does not violate R.C.2941.25(A) or the double jeopardy clause.
{¶ 159} Appellant's eighth assignment of error is overruled.
 IX
{¶ 160} Appellant's final assignment of error asserts appellant was denied his right to the effective assistance of counsel. Specifically, appellant argues counsel failed to request a merger of the offenses, and erred in opening the door to appellant's lack of remorse as addressed in the sixth assignment of error.
{¶ 161} The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064,80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373; State v. Combs, supra.
{¶ 162} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley,42 Ohio St.3d at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
{¶ 163} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
{¶ 164} Appellant argues his counsel's performance was deficient due to counsel's failure to request a merger of the offenses of drug trafficking and involuntary manslaughter, and due to counsel's "opening the door" as to appellant's lack of remorse.
{¶ 165} In appellant's eighth assignment of error, we addressed appellant's argument as to merger of the offenses, finding drug trafficking and involuntary manslaughter are not allied offenses of similar import. Accordingly, we do not find counsel's failure to request merger of the offenses deficient. Counsel is not required to make a motion which does not have a reasonable probability of success on the merits.
{¶ 166} Upon review of the record, appellant's argument of ineffective assistance due to counsel's opening the door as to appellant's lack of remorse also fails. Pursuant to the second prong of Strickland, supra, we cannot say, with a reasonable probability, the outcome of the trial would have been different but for the introduction of this evidence.
{¶ 167} Accordingly, appellant's ninth assignment of error is overruled.
{¶ 168} The conviction and sentence of the Ashland County Court of Common Pleas is affirmed.
Judgment affirmed.
Farmer and Edwards, JJ., concur.
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Ashland County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] "A decedent's contributory negligence does not exonerate criminal liability under R.C. 2903(B) unless such negligence was the sole proximate cause of the accident." State v. Garland
(1996), 116 Ohio App.3d 461.
[2] Had the objection been based on the witnesses' lack of personal knowledge; i.e., speculation, such objection would have been properly sustained. Even so, given appellant's testimony, such "assumption" would not have been prejudicial.